**DISTRICT OF COLUMBIA, Appellant,**

v.

**Reginald DUNMORE, Appellee.**

**No. 92–CV–754.**

District of Columbia Court of Appeals.

Argued May 11, 1994.

Decided July 24, 1995.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellant.

1. Section 12–309 provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan

Marc Fiedler, with whom Patrick M. Regan and Lisa R. Riggs, Washington, DC, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

We are called upon in this case to decide whether the discovery rule adopted in *Burns v. Bell,* 409 A.2d 614 (D.C.1979), applies to the notice requirement of D.C.Code § 12–309 (1989)[1] in suits brought against the District of Columbia. The trial court ruled that the six months within which a plaintiff, under the statute, must give notice to the Mayor of a claim against the District did not begin to run until that plaintiff discovered that a claim had accrued. We hold, to the contrary, that the legislative purpose and the plain language of section 12–309 are incompatible with the discovery rule. We therefore reverse the trial court's judgment against the District and remand the case with directions to dismiss appellee's claim for failure to comply with section 12–309. We also reverse the court's ancillary order directing the District to reimburse appellee for his attorney fees and related expenses.[2]

**I**

On June 6, 1987, appellee Reginald Dunmore, a diabetic, went to the Howard University Hospital emergency room complaining of pain in his left groin. Upon examining Mr. Dunmore, a doctor prescribed some pain pills and insulin and released him.

Mr. Dunmore's discomfort worsened over the next two weeks, and on June 22 he was admitted to District of Columbia General Hospital ("D.C. General") through its emergency room. A physician at D.C. General examined Mr. Dunmore and discovered that

> Police Department, in regular course of duty, is a sufficient notice under this section.

2. The District raises three additional issues on appeal, all of which relate to various trial court rulings during the second of the two trials in this case. In light of our holding that the complaint should have been dismissed even before the first trial because of appellee's failure to give timely notice under D.C.Code § 12–309, we need not address these other issues.

he had a heart murmur and was suffering from malnutrition. This initial examination of Mr. Dunmore also revealed a golf-ball-sized lump in his left groin. To combat the apparent infection in the groin area, the physician prescribed Erythromycin, a low-level antibiotic; however, for reasons undisclosed by the record, no antibiotic of any kind was administered that day.

The next day, Dr. Cuthbert Simpkins, the supervising physician in charge of Mr. Dunmore's treatment, ordered various tests, including an arteriogram and a sonogram. The sonogram was inconclusive, but the arteriogram revealed a blockage in Mr. Dunmore's left femoral artery, a major supplier of blood to the leg. The blockage was not complete, however; some blood was still flowing to Mr. Dunmore's left leg and foot. In light of these tests and examinations, Dr. Simpkins concluded that Mr. Dunmore had a mycotic aneurysm in his left femoral artery,[3] and that as a result his artery had become weakened, infected, and enlarged. Dr. Simpkins prescribed intravenous treatment with a series of more potent antibiotics, Vancomycin, Gentamycin, and Flagyl.[4] The first antibiotic treatment was given at approximately 9:00 p.m. on June 23, roughly thirty hours after Mr. Dunmore first came to the D.C. General emergency room.[5]

At approximately 1:00 a.m. on June 24, Dr. Simpkins and another surgeon operated on Mr. Dunmore to remove the infected portion of his femoral artery and the surrounding tissue. Dr. Simpkins testified that he had intended to perform a bypass procedure that would re-establish the circulation of blood to the leg. However, he did not attempt this procedure because the infection had not abated, and because the region of the artery where the bypass was to be performed was covered with pus. According to Dr. Simpkins' testimony, at this stage "[t]he leg was doomed."

Dr. Luis Queral, a vascular surgeon and one of Mr. Dunmore's expert witnesses, testified that the bypass procedure could have been performed by removing a saphenous vein from Mr. Dunmore's other leg and then grafting it in such a manner as to avoid the infected region altogether, thereby restoring the flow of blood to the infected leg. According to Dr. Queral, the failure of Mr. Dunmore's physicians to perform this procedure at some point, either before or soon after the resection of the aneurysm, was a breach of the applicable standard of care.[6]

After the operation, Mr. Dunmore began to have serious circulatory difficulties in his left leg. The pulse in the leg was greatly diminished. The leg itself became pale and caused him serious pain, and eventually he developed paralysis of the foot. After some time he noticed large black marks on his shin, and later on his toes and heel, which were not present before the surgery. His leg then began to turn purple and was cool to the touch, symptoms indicating a severe lack of oxygen to the leg. His groin infection also persisted. Finally, as a result of the circulatory failure, some of the tissues in Mr. Dunmore's left leg died and became gangrenous. As a consequence of the gangrene, a separate infection developed in his lower leg.

3. The doctor defined a mycotic aneurysm in this instance as "an area of infection around a blood vessel caused from injury due to [a] needle." The record indicates that Mr. Dunmore was a user of illegal drugs as well as an insulin-dependent diabetic.

4. Dr. Simpkins testified that because Dunmore was allergic to penicillin, the treatment of his infection was more complicated and risky than normal, in that the three antibiotics prescribed had serious potential side effects. He also said that the Erythromycin which had been prescribed the previous day, but never administered, would have been too weak to treat the infection.

5. Dr. Neal Crane, one of Mr. Dunmore's expert witnesses, testified that, by 8:00 p.m. on June 22, Dr. Simpkins and his subordinates had sufficient

information available to them from hospital records to prescribe the antibiotics which were ultimately administered twenty-five hours later. Dr. Crane also stated that infections as severe as the one discovered in Mr. Dunmore often double in size every twenty-four hours.

6. Dr. Simpkins testified that he had considered performing the graft procedure but found Mr. Dunmore's saphenous vein to be unsuitable for that purpose. Moreover, Dr. Simpkins was reluctant to attempt such a graft because of Dunmore's high temperature and malnourished condition. He said that a rupture of the bypass vessel would very likely have resulted in Mr. Dunmore's death.

On July 14, roughly three weeks after the initial operation, Dr. Simpkins and his team once again tried to perform the bypass procedure. However, because of the infection in Mr. Dunmore's lower leg, the surgeons had to abort the procedure. Consequently, the flow of blood was never restored, and on August 11 the surgeons were forced to amputate Mr. Dunmore's left leg above the knee. Mr. Dunmore was discharged from D.C. General on August 27, 1987.

Through his sister, Mildred Dunmore, Mr. Dunmore first sought legal representation on November 19, 1987, in contemplation of bringing a lawsuit. On that day Mildred Dunmore met with an attorney, Charles Smith, and asked him to "investigate the possibility of legal action against Howard University Hospital." Ms. Dunmore made no suggestion during this meeting that D.C. General had improperly treated her brother.[7] On January 12, 1988, Mr. Smith requested Mr. Dunmore's medical records from Howard University Hospital, which he received on March 15. These records shed little light on the case, however, prompting Mr. Smith to request Mr. Dunmore's medical records from D.C. General on March 22.[8]

D.C. General mailed the records to Mr. Smith on or about April 8. After receiving the records on April 14, Mr. Smith reviewed them and "saw some things that indicated that [Mr. Dunmore] had not received the proper attention that he should have." The very next day, April 15, 1988, pursuant to D.C.Code § 12–309, Smith gave notice to the Mayor that Mr. Dunmore was seeking legal recourse against the District and D.C. General for medical malpractice. On November 2, 1988, Mr. Smith filed a negligence action on Mr. Dunmore's behalf against the District and D.C. General, asking for four million dollars in damages.[9]

Before the first of two jury trials, the District filed a motion for summary judgment, arguing that Mr. Dunmore's case was time-barred under D.C.Code § 12–309. The District contended that the statutory six-month period within which a plaintiff must notify the Mayor of a claim against the District begins when the alleged injury occurs, not when the plaintiff has reason to believe that the District is or may be liable. Consequently, the District argued, the time within which Mr. Dunmore was required to give notice expired no later than February 11, 1988, six months after his leg was amputated; the notice sent by Mr. Smith on April 15, 1988, was more than two months too late, and thus the case should be dismissed. The court denied the motion, and the case proceeded to trial.

After the second trial,[10] the jury found the District liable for medical malpractice because of the doctors' failure to administer the antibiotics in a timely fashion and their failure to perform the bypass operation. The jury awarded Mr. Dunmore $850,000 in damages. The District filed a motion for judgment n.o.v. or a new trial in which it reasserted, *inter alia*, its contention that Dunmore's action was time-barred under D.C.Code § 12–309. After a hearing, the court denied the motion and entered judgment for Mr. Dunmore.

---

7. Ms. Dunmore testified that neither she nor her brother had any reason to believe that he had received negligent treatment at D.C. General until Mr. Smith reviewed the medical records from D.C. General in April 1988.

8. Mr. Smith testified that he sought the records from D.C. General "in order to have a complete medical picture of Mr. Dunmore's case."

9. On motion by the District, the trial court dismissed the claim against D.C. General because it is not *sui juris* and cannot be sued in its own name.

10. The first trial ended with a jury verdict in the District's favor. The jury found that Mr. Dunmore had not demonstrated that the doctors

were negligent either in failing to administer the stronger antibiotics sooner or in electing not to perform the bypass operation. Mr. Dunmore then moved for a judgment n.o.v., or in the alternative a new trial, asserting that the District had violated an *in limine* order concerning the exclusion of evidence of his drug use. The court granted the motion for a new trial, ordering that "[a]t the new trial, absolutely no mention of needle or puncture marks or drug use will be made either directly or indirectly." In addition, the District was ordered to pay all of Mr. Dunmore's attorney's fees and costs from the first trial.

## II

In *Burns v. Bell, supra,* this court held that in medical malpractice cases, a cause of action "accrues" for purposes of compliance with the statute of limitations "when the plaintiff knows or through the exercise of due diligence should have known of the injury." 409 A.2d at 617. The question before us in this case is whether the discovery rule applies to the notice requirement of D.C.Code § 12–309. We hold that it does not.

Our case law has firmly established that, because it is in derogation of the common law principle of sovereign immunity, section 12–309 is to be construed narrowly against claimants. *E.g., Hardy v. District of Columbia,* 616 A.2d 338, 340 (D.C.1992); *Romer v. District of Columbia,* 449 A.2d 1097, 1101 (D.C.1982); *Gwinn v. District of Columbia,* 434 A.2d 1376, 1378 (D.C.1981). Section 12–309 is not, and does not function as, a statute of limitations. Rather, it imposes a notice requirement on everyone with a tort claim against the District of Columbia, and compliance with its terms is "mandatory as a prerequisite to filing suit against the District." *Hardy, supra,* 616 A.2d at 340; *see Gwinn, supra,* 434 A.2d at 1378 ("[U]nless timely notice is given, no 'right of action' or 'entitlement to maintain an action' accrues"). As we explained in *Pitts v. District of Columbia,* 391 A.2d 803, 807 (D.C.1978):

> The rationale underlying the Section 309 notice requirement is (1) to protect the District of Columbia against unreasonable claims and (2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjusted and meritless claims resisted.

The statutory predecessor of section 12–309 was enacted in 1933 to deal with cases in which suits were filed against the District before the statute of limitations expired but long after the occurrence of the underlying event, a circumstance which often made it "impossible for the District of Columbia to obtain evidence for use in litigation which may result." H.R.REP. No. 2010, 72d Cong., 2d Sess. 1 (1933) (quoted in *Breen v. District of Columbia,* 400 A.2d 1058, 1060 (D.C.1979)); *see District of Columbia v. Leys,* 62 App.D.C. 3, 63 F.2d 646 (1932), *cert. denied,* 289 U.S. 756, 53 S.Ct. 787, 77 L.Ed. 1500 (1933).

It is therefore not surprising that the language Congress chose to remedy this problem is clear and unequivocal.[11] Section 12–309 specifically limits the District's waiver of its immunity to cases in which sufficient notice is given to the Mayor "within six months after the injury or damage *was sustained*" (emphasis added). By contrast, our statute of limitations, D.C.Code § 12–301 (1989), to which the discovery rule has thus far been exclusively applied, begins calculating the period within which a suit must be filed "from the time the right to maintain the action *accrues*" (emphasis added). "[O]ur discovery rule has been fashioned by construing the words 'accrued' or 'accrual' contained in our Statutes of Limitation. . . ." *Stager v. Schneider,* 494 A.2d 1307, 1316 (D.C.1985) (citations omitted). Consequently, the rule has been invoked in those cases in which the accrual of a cause of action is not altogether clear. *See, e.g., Colbert v. Georgetown University,* 641 A.2d 469, 472–473 (D.C.1994) (en banc) (discovery rule applies "[w]here the relationship between the fact of injury and the alleged tortious conduct may be obscure").[12]

The same analysis simply does not apply to section 12–309. The point in time when a cause of action accrues is immaterial for purposes of triggering the statutory notice requirement. Instead, under section 12–309, the six-month clock begins to run from the moment the plaintiff sustains the injury, not from the moment a cause of action accrues. *DeKine v. District of Columbia,* 422 A.2d 981, 985 (D.C.1980). Indeed, as we stated in *Gwinn,* a cause of action against the District does not even "accrue" until timely statutory

---

**11.** The 1933 statute is "nearly identical" to the present section 12–309. *See Breen, supra,* 400 A.2d at 1060 n. 2.

**12.** Under the discovery rule, a cause of action accrues when the plaintiff knows, or through the exercise of reasonable diligence should know, of "(1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C. 1989) (citation omitted).

notice has been given. 434 A.2d at 1378. Any other conclusion would be inconsistent with the plain language of the statute and contrary to its overriding purpose of providing the District with prompt notice of claims against it. *Pitts v. District of Columbia, supra,* 391 A.2d at 807. "We cannot properly read into § 12–309 a restrictive congressional intention which the statutory language does not reflect and the House report and debate do not directly acknowledge." *Breen v. District of Columbia, supra,* 400 A.2d at 1061.

Moreover, as we made clear long ago in *Gwinn,* section 12–309 was "designed to avoid, as applied to the District, the pitfalls of the statute of limitations." 434 A.2d at 1378. Thus in *Gwinn* we declined to incorporate D.C.Code § 12–302, which allows for the tolling of the statute of limitations during the minority of a prospective plaintiff, into section 12–309:

> To permit the notice period to be tolled, as appellant advocates, would create a situation where prospective litigants could delay in excess of seventeen years before notifying the District of their claim. Such an interpretation would totally frustrate the legislative intent.

*Id.* at 1378. Likewise, application of the discovery rule to section 12–309 would frustrate the express intent of Congress to ensure for the District a reasonable opportunity to investigate, and possibly to settle, any likely claims that might be brought against it. Indeed, where applicable, the discovery rule can have the effect of tolling the statute of limitations for a very long period of time. To read the discovery rule into section 12–309 would make section 12–309 a nullity in a sizable number of cases and would plainly disregard the congressional intent. We therefore must reject Mr. Dunmore's creative effort to read the word "injury" in section 12–309 to mean "actionable injury" so as to incorporate the discovery rule.[13]

We note, moreover, that in the great majority of cases, including the case at bar,

compliance with section 12–309 would not place an undue burden on litigants. Although strict observance of the statute's six-month time limit is essential, we have held that the actual content of the notice need not follow any rigid formula. *See Romer v. District of Columbia, supra,* 449 A.2d at 1101 ("'precise exactness' is not absolutely essential with respect to the details" (citations omitted)); *Washington v. District of Columbia,* 429 A.2d 1362, 1365–1366 (D.C.1981) (en banc). The statute requires only that the notice include a statement "of the approximate time, place, cause, and circumstances of the injury or damage." We have held that a claimant satisfies the "cause" requirement by including "facts from which it could be reasonably anticipated that a claim against the District might arise." *Pitts, supra,* 391 A.2d at 809. The "circumstances" presented in the notice need only be "detailed enough for the District to conduct a prompt, properly focused investigation of the claim." *Washington, supra,* 429 A.2d at 1366.

In light of the relative ease with which potential plaintiffs can preserve their claims against the District, there is nothing unreasonable in requiring an individual like Mr. Dunmore, who has incurred a very serious and obvious injury while under the care of a District employee in a medical facility owned and operated by the District, to file a section 12–309 notice within six months from the date of that injury. In fact, the record reveals that Mr. Dunmore suspected that he had received negligent treatment, albeit from Howard University Hospital, by November 1987—well within the six-month statutory period. Nothing prevented him from seeking medical records from Howard University Hospital, and later from D.C. General, while also taking the precautionary measure of notifying the District that he might file a negligence action in the future.

Finally, we reject Mr. Dunmore's assertion that *Kelton v. District of Columbia,* 413 A.2d

---

**13.** We leave for another day the more difficult issue of whether section 12–309 would bar a person from filing suit against the District when that person was unaware that he or she had suffered an injury and, as a consequence, had unknowingly allowed the six-month period to

elapse. Although we do not decide this point now, we think it would be far less ambitious to read "injury" in section 12–309 as denoting an injury of which one is aware, rather than as meaning "actionable injury" so as to incorporate the discovery rule *in toto.*

919 (D.C.1980), applies the discovery rule to the section 12–309 notice requirement. In *Kelton* a physician at D.C. General performed an unauthorized tubal ligation in the course of delivering a baby by Caesarean section in 1967. Between 1973 and 1975 the plaintiff and her husband unsuccessfully tried to have another child. In March 1976 a doctor informed Mrs. Kelton that "a tubal ligation might have been done in the past." *Id.* at 921. After obtaining her medical records from D.C. General in August or September 1976, Mrs. Kelton discovered that this in fact had happened. She gave notice to the District pursuant to section 12–309 on November 16, 1976.

The Keltons then filed suit against the District and the doctor who had performed the tubal ligation, but the trial court granted summary judgment for the District based on Mrs. Kelton's failure to give timely notice under section 12–309.[14] Before this court, Mrs. Kelton argued that the six-month period did not begin to run until a cause of action against the District had accrued. In rejecting this contention, we said:

> Mrs. Kelton argues that her action against the District of Columbia is not barred by the six-month notice requirement of D.C.Code § 12–309, contending that the period does not begin to run until "the complainant's cause of action has accrued." *The language of the statute, however, starts the clock at the moment "the injury or damage was sustained."*

*Id.* at 921 (emphasis added). We went on to say that, even if the discovery rule did apply to section 12–309, Mrs. Kelton's claim was barred because she was on inquiry notice from the time she was told by her doctor in March 1976 that a tubal ligation previously "might have been" performed.

Basing his argument on *Kelton* and on the court's subsequent discussion of that decision in *Bussineau v. President & Directors of Georgetown College,* 518 A.2d 423, 427–428 (D.C.1986),[15] Mr. Dunmore argues that the discovery rule applies to section 12–309. We disagree. First, the court in *Kelton* decided the section 12–309 issue by examining the actual language of the statute. 413 A.2d at 921. Only then did the court add that, "[e]ven defining 'injury' [as used in section 12–309] broadly, to encompass the discovery rule," the Keltons' claim was barred. *Id.* From the context it appears that the latter sentence was written in response to a specific argument raised by the Keltons and did not signal the adoption of the discovery rule in section 12–309 cases. We thus conclude that the latter sentence, beginning with the word "Even," is dictum rather than a holding.

Second, although *Bussineau* discusses *Kelton* in a manner consistent with Mr. Dunmore's interpretation, we emphasize that *Bussineau* was a case involving the statute of limitations and not section 12–309. Therefore, while *Bussineau's* discussion of the discovery rule may be instructive in cases in which the discovery rule applies, *i.e.*, statute of limitations cases, it has no bearing on section 12–309 cases. Also significant is the fact that two other decisions of this court have interpreted *Kelton* as rejecting the applicability of the discovery rule to section 12–309. *See Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1201 n. 16 (D.C.1984) (the court in *Kelton* "chose not to expand the discovery rule in the face of the plain statutory language of D.C.Code § 12–309"); *De-Kine v. District of Columbia, supra,* 422 A.2d

---

14. The claim against the doctor was dismissed as barred by the statute of limitations.

15. *Bussineau* involved only the statute of limitations, D.C.Code § 12–301, not the notice statute, D.C.Code § 12–309. In *Bussineau* we said:

> Since *Burns* [*v. Bell*], this court has acknowledged that the discovery rule requires knowledge of some wrongdoing in several cases. In *Kelton v. District of Columbia, supra,* we interpreted a notice statute which required parties intending to sue the District of Columbia for negligence to notify the District of such intent within six months after the injury was sustained.... We applied the discovery rule of *Burns v. Bell* ... to determine when the cause of action accrued; we concluded that the suit was barred because, for a time longer than the statutory period, she was on "inquiry notice that she might have suffered an actionable injury." ... Thus, in *Kelton,* we reiterated our interpretation of the discovery rule, noting that the statute of limitation for negligence begins to run at such time a prospective plaintiff gains inquiry notice that wrongdoing may be involved.

518 A.2d at 427–428 (citations omitted).

at 985 ("§ 12–309 starts the clock at the moment the injury or damage was sustained" (internal quotation marks omitted)). In short, whatever the exact impact of the *Kelton* decision may be, we are satisfied that it does not support the expansive reading of section 12–309 urged by Mr. Dunmore.

It is undisputed that Mr. Dunmore, through counsel, sent his section 12–309 notice to the Mayor on April 15, 1988. For the reasons set forth in this opinion, we hold that this was at least two months after the statutory six-month period had expired. We therefore reverse in its entirety the judgment of the trial court, including the award of attorney's fees and related expenses, and remand this case with directions to dismiss Mr. Dunmore's claim against the District.

*Reversed and remanded.*