DISTRICT OF COLUMBIA, Appellant,

v.

Angela Michelle ROSS, et al., Appellees.

No. 96–CV–266.

District of Columbia Court of Appeals.

Argued March 11, 1997

Decided June 12, 1997.

---

James C. McKay, Jr., Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

Daniel S. Kozma, Washington, DC, for appellees.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

█ By legislative enactment, no one may bring suit against the District of Columbia for damage to person or property unless "within six months after the injury or damage was sustained," proper written notice is given to the District. D.C.Code § 12–309 (1995). Here an infant child in a District public housing project ingested lead-based paint chips causing her blood lead level to rise to a level that resulted in her hospitalization for five days of chelation therapy. Three years later, she was diagnosed with neuropsychological damage as a result of the lead poisoning. At that point, the statutory notice was given to the District. The trial court held that the notice was timely. We disagree and reverse.

I.

From her birth on January 2, 1990 until December 10, 1991 Mikia Ross ("Mikia") lived with her mother, appellee Angela Michelle Ross ("Ross"), and maternal grandmother in a public housing complex owned and managed by the appellant District of Columbia at 232 W Street, N.W. During that

time Mikia allegedly consumed lead-based paint chips or flakes, and, as a result, suffered severe neuropsychological injuries.

On November 19, 1991, when she was twenty-two months old, Mikia underwent a routine blood screening for lead. Her blood level was 37 micrograms of lead per decaliter of blood ("ug/dL"). As a result, Mikia's pediatrician admitted her to Children's Hospital on December 3, 1991. Mikia's hospital records indicate that lead paint chips were found in her abdomen and bowels at that time. While in the hospital Mikia received five to six days of chelation therapy to reduce her blood lead levels. On December 7, 1991 her blood lead level peaked at 74 ug/dL, and thereafter steadily declined. Mikia was released from the hospital on December 9, 1991. On doctor's orders, Mikia and her mother moved out of her grandmother's apartment on W Street and into an apartment in Hyattsville, Maryland.

Before, during, and immediately after her hospitalization, Mikia showed none of the symptoms commonly associated with lead poisoning. However, because of the nature of lead poisoning and Mikia's young age, it was medically impossible to determine whether Mikia suffered neuropsychological damage as a result of her lead poisoning until she was old enough to be neuropsychologically tested. As a result, Ross did not know at the time of the hospitalization that Mikia would suffer such damage.[1] Mikia underwent neuropsychological testing on April 25–26, 1994, when she was four years old, and was diagnosed with "severe and permanent neuropsychological injuries" caused by lead poisoning.

On October 19, 1994, Ross' attorney notified the District of Mikia's injuries and her intention to file a lawsuit on behalf of Mikia pursuant to D.C.Code § 12–309. Ross filed suit against the District on November 15, 1994. The District's answer raised § 12–309 as a defense, and the District filed a motion for summary judgment arguing that Ross had failed to comply with § 12–309 because she had not notified the District within six months of Mikia's diagnosis with a high blood lead level in November 1991. Ross opposed the motion arguing that Mikia's elevated blood lead level was medically not an injury and that Ross did not know that Mikia was injured until her neuropsychological tests were completed.

The trial court denied the motion on October 2, 1995. In doing so, the trial court declared that it was deciding the issue left open in *District of Columbia v. Dunmore*, 662 A.2d 1356, 1360 n. 13 (D.C.1995), namely whether § 12–309 "would bar a person from filing suit against the District when that person was unaware that he or she had suffered an injury and, as a consequence, had unknowingly allowed the six-month period to elapse." The court considered "the present case to be the precise fact pattern described in the *Dunmore* footnote" because "[b]efore April 1994, Mikia Ross was completely asymptomatic and had suffered no actual harm or damages" and "[i]t was not until Mikia Ross was neuropsychological[ly] evaluated on April 25, 1994 that she discovered the injury." Ruling that § 12–309 did not bar a suit under such circumstances, the trial court denied the District's motion for summary judgment.

Subsequently, the District moved for certification of the issue for interlocutory appeal pursuant to D.C.Code § 11–721(d) (1995).[2]

---

**1.** An affidavit by Mikia's pediatrician states that she did explain to Ross "the possible effect of an elevated blood lead level and the potential for developmental and neurological problems" as well as "the need for long term follow up and continued monitoring of Mikia's blood lead levels, growth and development, and the need for adequate nutrition because blood lead poisoning may cause neuropsychological problems that may not present themselves until later."

**2.** D.C.Code § 11–721(d) (1995) provides in relevant part:

When a judge of the Superior Court of the District of Columbia in making in a civil case ... a ruling or order not otherwise appealable under this section, shall be of the opinion that the ruling or order involves a controlling question of law as to which there is substantial ground for a difference of opinion and that an immediate appeal from the ruling or order may materially advance the ultimate termination of the litigation or case, the judge shall so state in writing in the ruling or order. The District of Columbia Court of Appeals may thereupon, in its discretion, permit an appeal

Ross did not oppose the motion so long as the trial court did not stay the case during appeal. In an order docketed December 8, 1995, the trial court granted the motion for certification but refused to stay the case. The District filed a timely application for permission to appeal pursuant to § 11–721(d) and D.C.App. R. 5 on December 15, 1995. This court granted the District's application on March 12, 1996. On October 7, 1996 a motions panel of this court *sua sponte* stayed proceedings in the trial court pending the resolution of this appeal.

## II.

■ D.C.Code § 12–309 (1995) provides that

[a]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

"Our case law has firmly established that, because it is in derogation of the common law principle of sovereign immunity, section 12–309 is to be construed narrowly against claimants." *District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C.1995). Compliance with § 12–309 is a question of law that we review *de novo*. *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C.1995); *Washington v. District of Columbia*, 429 A.2d 1362, 1366 n. 15 (D.C.1981) (en banc).

In *Dunmore* we considered whether the discovery rule applicable to the statute of limitations applied to § 12–309. *Dunmore, supra,* 662 A.2d at 1359. Reginald Dunmore was a diabetic who went to the Howard University Hospital emergency room on June 6, 1987 complaining of a pain in his groin.

*Id.* at 1356. He was given some pain medication and discharged. *Id.* Two weeks later, on June 22, 1987, he was admitted to D.C. General where a golf-ball-sized lump was found in his groin. *Id.* at 1356–57. Further tests revealed an infected femoral artery. *Id.* at 1357. Two days after his admission to D.C. General, on June 24, 1987, Dunmore underwent surgery to remove the infected portion of the artery. *Id.* During the operation the surgeon failed to perform a bypass procedure, and, allegedly as a result, on August 11, 1987 Dunmore's leg was amputated above the knee. *Id.* at 1357–58. Dunmore retained an attorney to investigate a possible lawsuit against Howard for negligence, and during the investigation the attorney uncovered evidence of possible negligence by D.C. General. *Id.* at 1358. The attorney filed a § 12–309 notice on April 15, 1988, within six months of the discovery of evidence that D.C. General was negligent, but not within six months of the amputation of Dunmore's leg. *Id.* The trial court held that suit was not barred by § 12–309 because the discovery rule applied to § 12–309. *Id.*

On appeal Dunmore argued that the word "injury" in § 12–309 was equivalent with "actionable injury" and that the discovery rule was therefore applicable. *Id.* at 1360. We rejected this claim relying on the plain language of § 12–309 and its legislative purpose. *Id.* at 1359–60. We reserved judgment, however, on the question of whether § 12–309 barred suit when the claimant was unaware that he or she had sustained an injury. Specifically, in *Dunmore* footnote 13 we indicated that

[w]e leave for another day the more difficult issue of whether section 12–309 would bar a person from filing suit against the District when that person was unaware that he or she had suffered an injury and, as a consequence, had unknowingly allowed the six-month period to elapse. Although we do not decide this point now, we think it would be far less ambitious to read "injury" in section 12–309 as denoting an

to be taken from that ruling or order, if application is made to it within ten days after the issuance or entry of the ruling or order. An application for an appeal under this subsection shall not stay proceedings in the Superior

Court of the District of Columbia unless the judge of that court who made such ruling or order or the District of Columbia Court of Appeals or a judge thereof shall so order.

injury of which one is aware, rather than as meaning "actionable injury" so as to incorporate the discovery rule *in toto*. *Id.* at 1360 n. 13.

The trial court held that this case was "the precise fact pattern described in the *Dunmore* footnote" because Mikia was asymptomatic and Ross and her doctors did not know whether Mikia was injured as a result of the exposure to lead until her neuropsychological tests. We think this case is significantly different from the total lack of awareness envisioned in the quoted footnote.

The parties have devoted a great deal of energy to an argument about what Mikia's "injury" was and when exactly she was "injured." The District's principal argument is that Mikia's injury was lead poisoning and that her elevated blood lead level on November 19, 1991, or at latest her hospitalization from December 3–9, 1991, was when she was "injured." Ross counters that lead poisoning is not an "injury," and that Mikia was not known to be "injured" until her neuropsychological testing on April 25–26, 1994.[3] If we accept the District's argument, Ross' October 19, 1994 notice letter was filed more than two years late, but if we accept Ross' argument, then her notice was timely filed.

We need not resolve this particular dispute between the parties over which event constitutes the "injury." Instead we focus on when Mikia's injury was sustained because § 12–309 "starts the clock at the moment the injury or damage was sustained." *DeKine v. District of Columbia,* 422 A.2d 981, 985 (D.C. 1980); *Kelton v. District of Columbia,* 413 A.2d 919, 921 (D.C.1980). Thus, here we are required to determine whether Ross' October 19, 1994 notice letter was "within six months after the injury or damage was sustained." In cases involving direct physical injury the point in time at which the injury is sustained is obvious—it is the point when there is direct physical contact between the claimant's body and the instrumentality that

causes the injury. Thus, when an individual falls down steps, the injury is sustained at the moment of the fall, *see Wharton, supra,* 666 A.2d at 1229, and when an individual is falsely arrested, the injury is sustained at the moment of detention, *see DeKine, supra,* 422 A.2d at 986. Here because of the latent nature of lead poisoning it may be more difficult to say with total precision when Mikia's injuries were actually "sustained." However, having to choose between the point at which the lead first manifested itself in Mikia's system and the point several years later when her neuropsychological damage was confirmed, we think it more correct to say that she "sustained" the injury at least when the harmful material entered her body, was discovered, and resulted in significant medical procedures. This interpretation of § 12–309 is closer in line with the common-sense understanding of the phrase "injury was sustained."

The United States Court of Appeals for the District of Columbia Circuit confronted a somewhat analogous issue in *Nelson v. American Nat'l Red Cross,* 307 U.S.App. D.C. 52, 26 F.3d 193 (1994). There James Nelson, Sr. ("Nelson Sr.") contracted HIV from a blood transfusion. *Id.* at 54, 26 F.3d at 195. He subsequently developed AIDS and died. *Id.* Within three years of Nelson Sr.'s development of AIDS, but not within three years of his discovery that he was HIV positive, Nelson Sr.'s son, James Nelson Jr. ("Nelson Jr."), brought a survival action for negligence. *Id.* The Red Cross moved for summary judgment on statute of limitations grounds contending that Nelson Sr.'s cause of action had accrued under the discovery rule when he discovered he was HIV positive. *Id.* at 55, 26 F.3d at 196. The District Court granted summary judgment holding that "as surely as if he had been administered a poison or struck a blow" Nelson Sr.'s cause of action accrued when he discovered his HIV positive status. *Id.* On appeal the

---

**3.** Ross' argument that lead poisoning is not an "injury" is undercut to a certain degree by the assertion in her complaint that "[a]s a direct, foreseeable and proximate result of defendant's conduct, Mikia Ross suffered lead poisoning requiring painful and repeated medical examinations and tests; causing physical and mental suffering; harming and interfering with her daily life and childhood development; causing past and present fear, anxiety, and mental distress; and resulting in the likelihood of permanent, serious and irreparable mental and physical injury to her."

D.C. Circuit specifically rejected Nelson Jr.'s argument that Nelson Sr. was not injured until he developed AIDS. *Id.* at 55–56, 26 F.3d at 196–97. In so doing the court noted that "[c]ourts addressing the issue have uniformly held that a plaintiff is injured when he becomes HIV positive and that the statute of limitations begins to run as soon as the plaintiff discovers his injury through an HIV positive test result." *Id.*

 We find the rationale of the D.C. Circuit to be persuasive in this case. HIV/AIDS and lead poisoning are both latent conditions with serious potential consequences susceptible to discovery through blood testing.[4] Although *Nelson* involved the discovery rule rather than § 12–309, we think its conclusion that injury occurs when an individual becomes HIV positive reinforces the common sense conclusion that an injury is "sustained" for § 12–309 purposes when the defendant's negligence causes a foreign substance with harmful potential to be introduced into the body, or at the latest, when the substance is discovered in the body and medical procedures are given.

If anything, the case before us is stronger than *Nelson* because of the differing purposes underlying the statute of limitations issue in *Nelson* and the notice issue in our case. The statute of limitations cannot logically begin to run until a cause of action has accrued. The notice statute has a different purpose; namely, to alert the District to the possibility of future litigation so that it may promptly investigate the circumstances of the alleged adverse action by the District, memorialize any transitory evidence, and otherwise posture itself for potential litigation should it arise. *See Romer v. District of Columbia,* 449 A.2d 1097, 1101 (D.C.1982). With this purpose in mind, any doubt as to the proper timing for the giving of notice should be resolved in favor of earlier notice. Lack of full awareness of the seriousness of injury does not excuse failure to give notice of the fact of injury. *DeKine, supra,* 422 A.2d at 988.[5] As we have said, "[s]ection 12–309 is not, and does not function as, a statute of limitations." *Dunmore, supra,* 662 A.2d at 1359.

Accordingly, we reverse the trial court's denial of the motion for summary judgment and remand the case with directions to grant summary judgment for the District.

*Reversed and remanded.*[6]

---

4. We are aware that, as appellee's brief puts it, "[n]ot all children with lead poisoning profiles like Mikia's suffer neuropsychological injuries. Some children, in later neuropsychological testing and evaluation, show 'normal' test results."

5. These same considerations militate against any suggestion that the neuropsychological damage was a qualitatively different injury; on the contrary, it followed directly from the ingestion of lead.

6. Ross also contends that § 12–309 was satisfied by an "Initial Home Visit Questionnaire" prepared by an employee of the District of Columbia Childhood Lead Poisoning Prevention Program on December 10, 1991. We reject this argument as we have previously held that "[t]he statutory exception to formal notice ... is limited to police reports." *Campbell v. District of Columbia,* 568 A.2d 1076, 1078 (D.C.1990).