Jerrod TOLSON, et al.,
Appellants/Cross–
Appellees,

v.

DISTRICT OF COLUMBIA, et al.,
Appellees/Cross–Appellants.

No. 00–CV–1495.

District of Columbia Court of Appeals.

Argued Jan. 15, 2004.
Decided Oct. 21, 2004.

Gregory Lattimer, Washington, for appellants/cross-appellees.

Edward S. Schwab, Assistant Attorney General at the time the brief was filed,

with whom Charles L. Reischel, Deputy Attorney General at the time the brief was filed, and Arabella W. Teal, Interim Attorney General at the time the brief was filed, were on the brief, for appellees/cross-appellants.[*]

Before SCHWELB, RUIZ and REID, Associate Judges.

REID, Associate Judge:

This appeal involves issues related to the litigation of a civil suit against the District of Columbia and a Metropolitan Police Department ("MPD") officer, for alleged false arrest, malicious prosecution, and intentional infliction of emotional distress. After a jury verdict awarding compensatory and punitive damages to appellants/cross-appellees Jerrod Tolson and his father Antonio Tolson, the trial court vacated part of the award made to Mr. J. Tolson. Both the Tolsons, and the District and Officer Kurgan through the Office of the Corporation Counsel filed timely appeals. The appellants contend that the trial court did not have authority to vacate any part of the jury verdict. The appellees argue that the appellants did not provide notice under D.C.Code § 12–309 (2001) of their intent to seek damages for false arrest based on the initial stop and frisk of Mr. J. Tolson, and that the trial court should not have submitted the punitive damages issue to the jury. We affirm.

## FACTUAL SUMMARY

On July 17, 1998, Mr. J. Tolson was walking from the METRO station located

---

[*] At the time the briefs were filed, Messrs. Schwab, Reischel, and Ms. Teal were called Deputy Corporation Counsel, Assistant Corporation Counsel, and Interim Corporation Counsel, respectively. Since that time, however, the Mayor of the District of Columbia has issued an executive order re-designating the Office of Corporation Counsel as the Office of the Attorney General for the District of Columbia. See Mayor's Order No.2004–92, 51 D.C.Reg. 6052 (May 26, 2004) (citing D.,C.Code § 1–204.22(2) & (11) (2001)). See also, Office of the Attorney General, Office Order No.2004–28 (May 27, 2004). We therefore employ the titles applicable at the time of this opinion's publication.

at Minnesota Avenue and Benning Road, N.E., to his home. As he was walking, he was stopped by two patrol officers, Officer Scott Williams and Officer Bret Shapiro, who believed J. Tolson dressed and acted in a suspicious manner. J. Tolson testified that Officers Williams and Shapiro punched him in the back and threatened to place his face on the hood of the patrol car, which was hot from the summer sun and the engine. The officers detained and searched J. Tolson's person. They found no weapons and called in a radio check for outstanding warrants. When the officers determined that there were no warrants, J. Tolson was permitted to leave. Before leaving he attempted to get the names and badge numbers of the two officers. He testified that in response to his request the officers "said no. You're so smart, why don't you read them." J. Tolson stated that "when [he] got both of their names, . . . each of them was missing a number from the badge, [a]nd just to make sure that [he] had the information correct . . . [he] asked them and . . . [one officer said] you're so smart, why don't you read it."

Some time after he arrived home, J. Tolson told his parents about the incident. He took his mother to the location where the events occurred, and attempted to find the officers. Neither officer was present, but J. Tolson and his mother encountered Officer Casey who said he did not know the whereabouts of the other two officers. J. Tolson and his mother returned home. Officer Casey followed the Tolsons to their home in his police cruiser. When J. Tolson and Officer Casey had exited their respective vehicles, Officer Casey asked, "what's the problem." J. Tolson replied, "you saw the two white officers that had me stopped." Officer Casey reported the officers' belief that J. Tolson had been "dressed inappropriately." After comments were made as to what constituted appropriate dress, J. Tolson asked Officer Casey whether "he could get [the two officers because he] didn't know their names at the time." He had "looked at their names, but [he] hadn't remembered anything at the time."

Officer Casey testified that J. Tolson was belligerent and angry when he spoke to him at the home. As a result of J. Tolson's anger, Officer Casey called for other officers to join him on the scene. Officers Williams and Shapiro (the officers who had first stopped J. Tolson) and Master Patrol Officer Kurgan responded to the call for assistance. The Tolsons' account depicted the officers, especially Officer Kurgan, as acting without any reasonable basis to arrest them, and misstating what actually occurred.

Neighbors gathered on the sidewalk as the incident progressed. According to Officer Kurgan's testimony, J. Tolson insulted the officers and was belligerent. Officer Kurgan ordered all persons on the street to clear the street. J. Tolson objected to that order and Officer Kurgan arrested him for failure to obey. Mr. Antonio Tolson emerged from his home, believing that his son was being harassed, and reacted angrily. He voiced his objection to his son's arrest and the officer's order to leave the street and enter his home. Officer Kurgan continued to order A. Tolson to leave the street and enter his home, but he failed to comply. Officer Kurgan arrested him for failure to obey. Alesia Tolson, J. Tolson's mother, and Dyani Tolson, his sister, also were arrested by Officer Kurgan and charged with simple assault.

The Tolsons all brought suit, in September 1998, against the District of Columbia and Officer Kurgan, alleging false arrest, malicious prosecution, intentional infliction of emotional distress, and negligent supervision. The case went to trial on April 24,

2000 on the first three counts. On May 3, 2000, the jury returned a verdict in favor of two of the plaintiffs, awarding $50,000 in compensatory damages and $100,000 in punitive damages to Antonio Tolson, and $200,000 in compensatory damages and $25,000 in punitive damages to Jerrod Tolson. Of the $200,000 award in compensatory damages to J. Tolson, $175,000 represented "liability as a result of the detention by Officers Williams and Shapiro." that is, the initial stop of J. Tolson. After the verdict, the appellees renewed their request for a directed verdict. Although the trial judge instructed the parties to submit memoranda by May 18 on whether the punitive damages question should have been sent to the jury, it nevertheless docketed and mailed its entry of judgment on the jury verdict to the parties on May 8, 2000.

On May 12, 2000, the District and Officer Kurgan filed an emergency motion to vacate the May 2000 judgment. They alleged that the judgment was entered in error because the trial court had scheduled oral argument relating to punitive damages on May 18th. The District also argued it was prejudiced by the entry of the judgment, because it was precluded from filing a post-trial motion within the jurisdictional limit of 10 days. On May 12th the trial judge granted the motion and vacated the judgment entered by the clerk. On May 26, 2000, the trial court heard arguments on the appellees' motion for judgment as a matter of law made during trial but taken under advisement by the trial court. The court denied the motion for judgment as a matter of law.

On June 12, 2000, the District and Officer Kurgan renewed their motion for judgment as a matter of law or, in the alternative a new trial. The appellants moved to strike the renewed motion as untimely. On July 3, 2000, the trial court docketed an order of judgment containing the jury verdict. On July 10, 2000, appellees filed another renewed motion for judgment as a matter or law, or for remittitur or a new trial, which was basically identical to the one submitted on June 12th. On October 10, 2000, the trial court docketed an order vacating $175,000 of the $200,000 the jury awarded to J. Tolson in compensatory damages. This sum represented damages related to the initial stop and frisk of J. Tolson. The trial court concluded that the District did not receive notice that J. Tolson's false arrest claim was based in part on the initial stop.

## ANALYSIS

### The Trial Court's Decision to Vacate Its Entry of Judgment in May 2000

Appellants contend that the order of judgment entered on May 8, 2000 was correctly filed and docketed, and hence, the appellees' June 12, 2000, renewed motion for judgment as a matter of law was untimely. They assert that the trial court had no authority under Super. Ct. Civ. Rules 58 and 50(b) to vacate a properly entered order; therefore, the court erred in disturbing the May 8, 2000 judgment and should not have vacated $175,000 of the compensatory damages award to J. Tolson. Appellees contend that the May judgment contained numerous clerical errors, such as, placing the burden of paying the judgment on Officer Paul Kurgan instead of the District of Columbia, misspelling J. Tolson's name, and indicating, "plaintiffs take nothing" instead of the correct statement, that Alesia and Dyani Tolson take nothing. Thus, they maintain that the court was within its authority to vacate the judgment to correct clerical errors pursuant to Super. Ct. Civ. R. 60(a). They contend that the trial court intended to hear oral argument on outstanding motions before entering judgment. And in

the alternative they maintain that their motion to vacate the May 2000 entry of judgment was properly granted under the "doctrine of 'unique circumstances.'"

D.C.Code § 17–305(a) (2001) specifies that "[w]hen the issues of fact were tried by jury, the court shall review the case only as to matters of law." *See District of Columbia v. Harris,* 770 A.2d 82, 89 (D.C. 2001). Legal questions are reviewed *de novo. See Perkins v. District of Columbia Bd. of Zoning Adjustment,* 813 A.2d 206, 215 (D.C.2002).

Our review of the trial court's May entry of judgment, and its subsequent decision to vacate that judgment, requires us to focus initially on Super. Ct. Civ. R. 58 and 50(b), which provide in pertinent part:

Rule 58. *Entry of judgment.*

Subject to the provisions of Rule 54(b): (1) Upon a general verdict of a jury, or upon a decision by the Court that a party shall recover only a sum certain or costs or that all relief shall be denied, the Clerk, unless the Court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the Court. . . .

Rule 50 (b). *Renewing motion for judgment after trial; alternative motion for new trial.*

If, for any reason, the Court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the Court is considered to have submitted the action to the jury subject to the Court's later deciding legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment— and may alternatively request a new trial or join a motion for a new trial under Rule 59. . . .

■ Super. Ct. Civ. R. 58 specifies that "the Clerk, *unless the Court otherwise orders,* shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the Court. . . ." (Emphasis added.) The critical language applicable to this case is, "unless the Court otherwise orders." During the May 26, 2000 hearing, the trial judge explained that she had "deferred ruling on what was really a motion pursuant to [Super. Ct. Civ. R.] 50 [judgment as a matter of law] at the conclusion of the Plaintiff's case that was renewed at the end of the trial." She added:

And following the verdict in favor of Plaintiffs Antonio and Jer[r]od Tolson, I set a hearing on that motion, and I subsequently issued an order directing the parties to submit memoranda of law on the issue of the appropriateness of sending the question of punitive damages to the jury. . . .

By issuing that order, the trial court undoubtedly decided not to enter judgment on the jury's verdict until appellees' motion for judgment as a matter of law could be resolved. Indeed, as the trial judge stated at the May 26 hearing:

Without my knowledge, and without my having made a decision to do so, a judgment had been issued earlier. . . . I vacated that immediately [upon receiving appellees motion to vacate the May 2000 judgment] because it was not my plan to issue a judgment at that time because I had not ruled on this motion which I had deferred ruling on. That was a matter of miscommunication between me and the clerk. . . .

Thus, contrary to appellants' argument, the trial court did not violate Rule 58 because, as authorized by the words "unless the Court otherwise orders," the trial judge in this case had "ordered" that the punitive damages issue, as well as the deferred motions regarding judgment as a

matter of law were to be resolved prior to entry of judgment.

Nor did the trial court violate Super. Ct. Civ. R. 50. The plain language in that rule contemplates the possibility that the trial court will not rule on a motion for judgment as a matter of law until after the jury verdict: "If, for any reason the Court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the Court is considered to have submitted the action to the jury subject to the Court's later deciding the legal questions raised by the motion." Super. Ct. Civ. R. 50(b). This interpretation is consistent with that pertaining to identical Fed.R.Civ.P. 50 which is "persuasive authority in interpreting" the local rule. *Vale Props., Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 14 n. 3 (D.C.1981). The Seventh Circuit has held "that a court may expressly reserve decision on a motion for directed verdict." *Shaw v. Edward Hines Lumber Co.*, 249 F.2d 434, 437 (7th Cir. 1957) (citing *Karnowski v. Skelly Oil Co.*, 174 F.2d 770, 773 (10th Cir.1949); *Western Union Tel. Co., v. Dismang*, 106 F.2d 362, 364 (10th Cir.1939)). And, the Second Circuit has recommended that trial courts reserve their decisions on such motions. *See Fratta v. Grace Line, Inc.*, 139 F.2d 743, 744 (2nd Cir.1943). This recommendation is made, not only for the purpose of avoiding unnecessary delay, but also to provide a procedure which gives the trial judge adequate opportunity to scrutinize the record and make informed rulings. *See Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 658–60, 55 S.Ct. 890, 79 L.Ed. 1636 (1935); *Shaw v. Edward Hines Lumber Co.*, 249 F.2d 434, 437 (7th Cir.1957).

Here the trial court explicitly stated each time the District moved for a directed verdict that it would consider the motions at the end of the trial, and even after the jury had returned with its verdict, the court declared that it would, "rule on the motion for directed verdict at a later date and set a hearing for May 18[th], 2000, on the motion." The trial court exercised its discretion to delay ruling on the District's motions, an action consistent with *Karnowski, supra*. Furthermore, as appellees argue, the trial court had authority to vacate the May 8, 2000 entry of judgment under Super. Ct. Civ. R. 60(a) because of the clerical errors in that order. *See* Super. Ct. Civ. R. 60(a) ("Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative . . . ."). In sum, the trial court had the authority to vacate the May 8, 2000 order of judgment.

We now address the timeliness of the appellees' renewed motion for judgment as a matter of law. Under Super. Ct. Civ. R. 50 and 59, a motion to alter or amend judgment must be filed within 10 days of the entry of judgment, and a judge has no authority to decide untimely motions. *See D.D. v. M.T.*, 550 A.2d 37, 42 (D.C.1988). Nor may the judge extend the deadline for filing a Rule 50 or 59 motion. *Center for Nuclear Responsibility, Inc. v. United States Nuclear Regulatory Comm'n*, 251 U.S.App. D.C. 82, 88, 781 F.2d 935, 941 (D.C.Cir.1986); *Derrington–Bey v. District of Columbia Dep't of Corrections*, 309 U.S.App. D.C. 132, 133, 39 F.3d 1224, 1225 (D.C.Cir.1994). Here, at the end of the hearing on May 26, 2000, pertaining to the emergency motion to vacate the May 8, 2000 order of judgment, the trial court stated: "We will issue a judgment now." The court clerk's memorandum log in the record before us shows an entry on June 8, 2000 which states: "Judgment order filed." No corresponding written judgment appears in the record. However, the record contains an order of judgment signed on

June 25, 2000 and docketed on July 3, 2000, which reflects the jury's verdict. The appellees re-filed their renewed motion on July 10, 2000. Thus, as the trial court concluded in denying plaintiffs' motion to strike the defendants' renewed motion, "Defendant's post-trial motion filed on June 12, 2000 ... and re-filed on July 10, 2000, is ... timely, having been filed within ten days after entry of the Judgment." In light of our conclusion that the District's renewed motion was timely, we do not address the District's alternative argument based on "the doctrine of 'unique circumstances.'"

*The Compensatory Damages Award to J. Tolson Based on the Initial Stop*

Appellants contend that the trial court erred in its determination that the District did not have notice that they intended to base their false arrest claim on the initial stop and frisk of J. Tolson, in addition to the events leading to the arrests at the Tolson home. The District argues that it did not receive proper notice of this claim under § 12–309,[1] and further, that this claim was not set forth in appellants' complaint nor in the joint pretrial statement. In addition, the District argues that it was prejudiced in its defense against the claim since it could have shown that the stop was legally justified. We review this issue *de novo* since it involves a legal question. *See* D.C.Code § 17–305 (2001); *Arnold & Porter, supra,* 756 A.2d at 436.

■ The record before us shows that the § 12–309 letter [2] which appellants sent

---

1. The District raised a § 12–309 issue prior to trial, but not in relation to the initial stop with respect to which it sought to limit testimony at trial since that stop was not set forth as a claim in the complaint or the joint pretrial statement. And, apparently there was no specific reference to § 12–309 during the post-trial consideration of the § 12–309 issue. Nevertheless, because the District raised a § 12–309 issue in a pre-trial motion, and on appeal, and because § 12–309 notice is mandatory, we reiterate pertinent case law. "[C]ompliance with [the] terms of [§ 12–309] is 'mandatory as a prerequisite to filing suit against the District.'" *District of Columbia v. Dunmore,* 662 A.2d 1356, 1359 (D.C.1995) (quoting *Hardy v. District of Columbia,* 616 A.2d 338, 340 (D.C.1992)). Moreover, § 12–309 is to be construed narrowly against claimants "because it is in derogation of the common law principle of sovereign immunity." *District of Columbia v. Arnold & Porter,* 756 A.2d 427, 436 (D.C.2000) (citations omitted); *Hardy v. District of Columbia,* 616 A.2d 338, 340 (D.C.1992); *Romer v. District of Columbia,* 449 A.2d 1097, 1101 (D.C.1982); *Gwinn v. District of Columbia,* 434 A.2d 1376 (D.C.1981). "Section 12–309 is not, and does not function as, a statute of limitations." *Dunmore, supra,* 662 A.2d at 1359 (quoting *Hardy, supra,* 616 A.2d at 340). Furthermore, "[w]hile this court has not required 'precise exactness' in the notice statement, the requirements of the statute are nevertheless to

be strictly construed." *Braxton v. National Capital Hous. Auth.,* 396 A.2d 215, 217 (D.C. 1978) (citations omitted).

The court has stated that even though notice need not comply with the "preciseness" of § 12–309, the Mayor must still be made aware of the actions which led to the charges. The court has allowed that notice to come in the form of a plaintiff's letter to the mayor or by way of "police reports made in [the] regular course of duty [so long as they are] sufficient to give the [District] government notice of a claim." *Braxton,* 396 A.2d at 217. The purpose of this notice is to, "(1) protect the District of Columbia against unreasonable claims and (2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjusted and meritless claims resisted." *Pitts v. District of Columbia,* 391 A.2d 803, 807(D.C.1978).

2. The § 12–309 letter stated:

On or about July 18, 1998 at approximately 5:00 p.m., several officers of the Metropolitan Police Department falsely arrested Antonio Tolson and Jerrod Tolson for "failure to obey" and Alesia M. Tolson and Dyani Tolson for simple assault while they were standing in front of their home located at 4256 Meade Street, N.E., Washington, D.C. 20019. The Officers falsely arrested these four individuals

to the District prior to the commencement of trial litigation, does not mention the initial stop of J. Tolson. Indeed, the letter focuses solely on events outside the Tolson home—after the stop of J. Tolson in a different location. Nor does the joint pretrial statement alert the District that J. Tolson is claiming false arrest based on the initial stop of his person. The section setting forth "plaintiffs' claims" begins with: "plaintiffs claim that while they were in front of their home ...," and under the false arrest discussion, there is no mention of the initial stop. Appellants nevertheless argue that their responses to appellees' interrogatories provided the required specificity. Those responses contain a detailed account of the initial stop of J. Tolson as well as the later arrest in front of the Tolson home. While this account may have given the District constructive notice that the appellants might include the initial stop of J. Tolson as part of their claim, appellants' complaint contained only one sentence about the initial stop. And, neither the § 12–309 letter nor the joint pretrial statement set forth the initial stop as a claim. Therefore, the District could have believed reasonably that appellants' theory of false arrest was based solely on events in front of the Tolson home, rather than both those events and the initial stop of J. Tolson.

In addition, the discussion at the beginning of the trial concerning the initial stop did not identify that stop as part of the false arrest claim. Before the trial actually began, the District asked that testimony about "the initial stop" of J. Tolson be limited, but not excluded altogether, because "this case is about a false arrest that occurred in front of ... the Tolson's house. And there's no claim going directly to the initial stop and frisk...." Appellants' counsel did not object to this characterization of appellants' case. The District was willing to stipulate, however, that the stop occurred. The court instructed the District "to make appropriate objections or request an instruction" during trial, if necessary. At the close of the plaintiffs' case the District moved for judgment as a matter of law, and again at the close of trial, prior to jury deliberations. The trial judge took both motions under advisement and indicated she would rule on them after the jury verdict.

When the trial court revisited the initial stop issue after trial, appellants may have been justifiably confused by what they deemed to be the trial court's reversal of position as to whether the initial stop and frisk of J. Tolson was a basis for liability. Indeed, during discussion with the parties about jury instructions, the trial court stated, "[e]verybody knew that the stop and frisk played a role in the claim, even if it wasn't a basis for the claim." But having signaled that the stop may not have been "a basis for the claim," the trial court nevertheless instructed the jury that both the initial stop of Mr. J. Tolson and the arrests in front of the Tolson home should be taken into consideration with respect to the false arrest claim:

> Each plaintiff has brought a claim of false arrest. Here is the legal definition of an arrest for purposes of evaluating a

---

when they knew or should have known that they had not committed any crime or violated any law. In so doing, they falsely arrested, falsely imprisoned, and maliciously prosecuted them.

As a result of the Metropolitan Police Department officers' false arrest, false imprisonment, malicious prosecution these four (4) individuals were traumatized, embarrassed, humiliated, subjected to ridicule and have severe mental anguish.

Accordingly, Antonio Tolson, Jerrod Tolson, Alesia M. Tolson and Dyani tolson hereby notify the District of Columbia of their claim for damages in an amount not less than $600,000, plus reasonable attorney's fees.

claim of false arrest. An arrest occurs whenever a person is detained or restrained from exercising his or her full liberty by one or more persons against his or her will. In this case, there was a detention of Jerrod Tolson near the entrance to Kenilworth Park. There was also the act of taking into custody of all the plaintiffs on Mead Street which is typically referred to as arrest in the criminal law. Both of these detentions are arrests for purposes of evaluating a claim of false arrest. . . .

With respect to Jerrod Tolson, the District of Columbia is also liable for false arrest if the detention by Officers Williams and Shapiro near the entrance to Kenilworth Park constituted a false arrest as I am now defining the term.

Nevertheless, the trial court ultimately focused on the District's prejudice argument with respect to its assertion of lack of proper notice about the false arrest claim based on the initial stop, and in doing so, the court re-examined the complaint and joint pretrial statement. In her order, docketed on October 10, 2000, the trial court stated:

It is clear from the Complaint that the initial stop of [ J.] Tolson was the event that sparked the later controversies out of which the causes of action in this case arose. However, although the complaint is somewhat ambiguous, it does not appear to include the initial stop of [J.] Tolson as part of the false arrest claim.

Nor did the court find that the joint pretrial statement put the District on notice of a false arrest claim based on the initial stop:

The joint pretrial statement unambiguously defines the false arrest claim as a claim based solely on the arrests that occurred at [the Tolson house], not on the initial stop. There is not any suggestion in the pretrial statement that

[Mr. J.] Tolson claimed that the initial stop constituted a false arrest.

The trial court declared "that it was unfair and extremely prejudicial to the District to permit [Mr. J.] Tolson to go forward with a cause of action of which the District first received notice immediately prior to the start of the trial." The District indicated that had it known that the initial stop was part of the false arrest claim, it would have presented the testimony of Officer Shapiro since he was one of the officers involved with the initial stop. Moreover, because the District had requested at the start of trial that the testimony on the initial stop be limited because it was not a claim set forth in the complaint nor the joint pretrial statement, few questions about the initial stop were posed to Officer Williams, the other officer concerned with the initial stop. Thus, there can be no doubt that the District was prejudiced by the failure of appellants to put it on notice that the initial stop was part of the false arrest claim. Hence, the trial court did not err in setting aside the damages award to J. Tolson based on the initial stop.

*Punitive Damages*

Appellees argue that the trial court should not have submitted the issue of punitive damages to the jury because "[t]he evidence at trial established that no award of punitive damages was legally permissible in the circumstances of this case." The trial court rejected the appellees' argument during the May 26, 2000 hearing, and again in its order docketed on October 10, 2000. The awards amounted to $100,000 to A. Tolson and $25,000 to J. Tolson against defendant Paul Kurgan, but no award was made against the District. Appellants contend that the punitive damages issue was properly submitted to the jury.

■ "[P]unitive damages may be awarded only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.'" *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997). We have described the prerequisite state of mind as, "outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Chatman v. Lawlor,* 831 A.2d 395, 400 (D.C.2003); *see also Vassiliades v. Garfinckel's, Brooks Bros., Miller & Rhoades, Inc.,* 492 A.2d 580, 593 (D.C.1985).

■ Appellees' argument that appellants "failed to establish the requisite aggravated conduct and state of mind through the heightened clear and convincing standard," raises no due process, Eighth Amendment or other constitutional violation claims. "If no constitutional issue is raised, the role of the appellate court ... is merely to review the trial court's 'determination under an abuse-of-discretion standard.'" *Cooper Indus. v. Leatherman Tool Group,* 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). We conclude that the trial court did not abuse its discretion in allowing the issue of punitive damages to be submitted to the jury.

■ Here, the trial judge stated in denying the District's motion regarding punitive damages: "[I]t seems to me there is evidence in this record upon which a reasonable juror, when I take the inferences in the light most favorable to the Plaintiff[s], could find in favor of the Plaintiff[s] on the issue of punitive damages." Furthermore, the trial court declared:

> I think that one interpretation of the evidence is that Officer Kuran, knowing that he did not have a sound arrest, ...

took steps to exaggerate, to misrepresent what had occurred, and that Plaintiff[s][are] in a position, therefore, to argue that that was intended to insure a subsequent prosecution that was ill-founded by making this look like a more serious event than it was. . . .

We are satisfied that the trial judge applied the correct legal standard and thus did not abuse her discretion. As we said in *King v. Kirlin Enters., Inc.,* 626 A.2d 882 (D.C.1993): "[W]e have repeatedly recognized that a plaintiff['s] request to submit the issue of punitive damages to the jury is governed by the normal test for a triable issue of fact: whether there was evidence from which a jury reasonably could find the required malicious intent or willful disregard of another's rights." *Id.* at 884 (citations omitted). Furthermore, our review of the record in this case shows sufficient evidence to satisfy the requirements for a punitive damages award. *See District of Columbia v. Jackson,* 810 A.2d 388, 396 (D.C.2002) ("[A] reasonable juror could have found by the 'more stringent' proof requirement of clear and convincing evidence that [Officer Kurgan acted] with an evil motive or actual malice.") (citation omitted).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*