**Virginia HUBBARD, Appellant,**

v.

**Dr. Ira W. CHIDEL, et al., Appellees.**

**No. 98–CV–221.**

District of Columbia Court of Appeals.

Argued Feb. 7, 2001.
Decided Jan. 31, 2002.

Frederic W. Schwartz, Jr., with whom Daniel E. Schultz, Washington, was on the brief, for appellant.

Albert D. Brault, Washington, with whom Joan F. Brault was on the brief, for appellees.

Before WAGNER, Chief Judge, and STEADMAN and REID, Associate Judges.

REID, Associate Judge.

This case presents a challenge to the trial court's post-trial indemnification and contribution ruling relating to a million dollar jury verdict in a medical malpractice case. The trial court decided that: (1) the defendants (here the appellees) were entitled to indemnification from the settling defendants, even though the jury found appellees liable for the injury to the appellant; and (2) the appellant could take no more than the $500,000 she received from the settling defendants.

Finding error, we reverse and remand this matter to the trial court for further proceedings consistent with this opinion. Furthermore, we conclude that: (1) in trying equitable claims of indemnification and contribution following a medical malpractice liability and damages trial, where other potential tortfeasors have settled with the plaintiff prior to trial, the trial court may not make factual findings inconsistent with the jury's findings, unless they are made in response to an appropriate and timely post-trial motion designed to set aside the jury's verdict; (2) non-contractual indemnification is inappropriate where, as here, joint tortfeasors are guilty of active negligence and their negligence concurs in causing the injury; (3) to resolve the contribution issue in this case, the trial

court must determine the respective status of Dr. David King, the Southwest Neighborhood Clinic ("the Southwest Clinic"), and the District of Columbia ("the District"), specifically, whether Dr. King and the District constitute a single tortfeasor or two tortfeasors, and whether the Southwest Clinic may properly be considered a joint tortfeasor when it was not impleaded; and (4) under D.C.Code § 12–309 (2001 Official Code), notice to the District of an equitable claim of contribution is not required until the entity seeking contribution has suffered injury, that is, has been sued or served with a plaintiff's summons and complaint for damages.

## FACTUAL SUMMARY

The testimony presented at trial in this case reveals the following facts. On January 25, 1993, appellant Virginia Hubbard was referred to the Greater Southeast Community Hospital ("GSECH") by her primary care physician, settling defendant Dr. King, to undergo a mammogram screening. Dr. King worked for the Southwest Clinic operated by the District, also a settling defendant. On March 5, 1993, Ms. Hubbard reported to GSECH for her mammogram. After reviewing the mammogram, appellee Dr. Ira W. Chidel, a radiologist, noted the following:

suspicious 1.2 cm mass-type density beneath the nipple on the left. Additional studies are recommended for further evaluation. Dr. King has been notified of these findings.

Although Dr. Chidel claimed that he notified Dr. King of his findings,[1] Dr. King

---

1. Dr. Leonard M. Glassman, testifying on behalf of Dr. Chidel, stated that when a screening report presents "significant positive result[s]," the standard of care requires that the radiologist "make sure that the information [i]s conveyed to the referring physician or somebody who worked with the referring

physician." He stated that although radiologists "often did" record that they reported the information to the referring physician, "[i]t was not obligatory."

Dr. Glassman further testified that by: 1) calling Dr. King after noticing the abnormal report; 2) making a computer report that he

denied ever being informed of the suspicious mass.[2] Consequently, Ms. Hubbard did not learn about the mass until approximately one year later, in July 1994.[3] Subsequent tests confirmed that the mass was cancerous. Ms. Hubbard had a mastectomy around September 1994.

Later, on May 17, 1995, Ms. Hubbard filed a complaint against GSECH, Dr. Chidel, and Dr. King alleging medical malpractice. In her complaint she maintained that:

> [GSECH] acting through its radiology department and its employee physicians in said department, including its radiologist physician defendant Dr. Chidel, [ ] failed to exercise reasonable medical care with respect to [mammograms taken in January 1992 and March 1993]

including: (a) failing to detect and report the presence of a suspicious finding of possible mass in [her] left breast ..., and; (b) failing to use reasonable care in communicating both orally and in writing the abnormal findings of the 1993 mammogram to defendant Dr. King.

In addition, in 1993, defendant Dr. King failed to exercise reasonable medical care in that he either failed to follow the radiologist's recommendations, and failed to otherwise initiate any further diagnostic steps when he received the mammogram report from defendant [GSECH] or, alternatively, if he did not receive said report, defendant Dr. King (and/or his medical or support staff employees in his office) failed to realize the fact that the report was missing/had not

contacted Dr. King; and 3) disseminating the report after reviewing it to determine "if it accurately reflected his interpretation and was appropriately typed," Dr. Chidel clearly followed the appropriate standard of care. Furthermore, Dr. Glassman testified that the computer program used by Dr. Chidel, to record and disseminate the report, complied with the standard of care. In addition, he stated that an "average [of] a couple of inquiries [to GSECH] per week" by referring physicians, as to the whereabouts of such reports, was a number that fell within "the standard of care."

**2.** At trial, in response to the question: "[n]ow, in terms of the standard of care, [ ] what was the standard of care for a radiologist in your position in [ ] March of 1993, when an abnormality was found?," Dr. Chidel stated:

> The standard of care for any mammogram that is positive is to contact the physician. In our practice, we did it by telephone, one-to-one contact in order to notify them of the abnormality, following that with a report to be mailed—typed out or written out and mailed to him.

Dr. Chidel also noted that "the referring physician" has the responsibility to follow-up with the radiologist to verify that the report was indeed received.

**3.** Dr. Arnold Friedman, testifying on behalf of Ms. Hubbard, stated that when a screening

mammogram presents abnormal findings, the standard of care requires the screening radiologist to contact "the referring physician either by telephone or by certified mail." However,

> if there was a phone call that was documented, the written report could be sent out by ordinary mail. If it were chosen to communicate by certified mail, the written report would be sent out by certified mail; notice would be made in a logbook; and, you'd get the little green card saying the mail was received, and that would be checked off in the logbook. Certainly, you could use a computer to do that, but a logbook would be fine.

Furthermore,

> The positive mammograms would be kept track of. And in approximately a month after the issuance of the report, attempts would be made to contact the referring physician to find out what action was taken based on the mammographic report. And you would also try and find out the results of the surgery.

Dr. Freidman also testified that GSECH did not comply with the applicable standard of care, with regard to ensuring the proper distribution of mammographic screening reports, because "they had no separate provision for dealing with abnormal reports."

been received, and failed to communicate with defendant Southeast or otherwise take any steps to secure or locate the missing report.

On January 25, 1996, Ms. Hubbard requested leave to file an amended complaint to add Wener, Boyle & Associates, P.A. ("Wener") as a defendant. Wener was Dr. Chidel's employer and the corporation with which GSECH contracted to provide diagnostic radiology reports.[4] The trial court granted Ms. Hubbard's request in early April 1996.

In response to Ms. Hubbard's amended complaint, claims for contribution or indemnity were made as follows: (1) on May 2, 1996, a cross-claim by GSECH against Dr. King; (2) on May 3, 1996, a third-party complaint by Wener against the District as an employer of Dr. King, after Wener served notice of its claim on the District on May 1, 1996; (3) on May 3, 1996, a cross-claim by Dr. Chidel and Wener against Dr. King; and (4) on August 27, 1996, separate cross-claims by the District and Dr. King against Dr. Chidel and Wener.

Prior to trial, Ms. Hubbard entered into a settlement and release agreement with Dr. King and the District of Columbia in the amount of $500,000. The release stated, in relevant part:

As further consideration for payment of said sum and waivers, I hereby agree to indemnify and hold harmless the District of Columbia, its officers, agents, servants, independent contractors and employees, and Dr. David King, from any and all claims of indemnity and/or contribution brought by the remaining defendants [ ] including [ ] Chidel, [ ] Wener, [ ] and [GSECH], and any others.

As further consideration for payment of said sum and waivers, I hereby agree to indemnify and save harmless the said Dr. [ ] King and the District of Columbia, its officers, agents, independent contractors and employees, against any and all further claims for damages, costs and expenses arising out of injuries to myself from the said incident. . . .

In light of the pre-trial settlement agreement, the remaining parties agreed that the trial judge would try the cross-claims and the third party claim relating to indemnification and contribution following the jury trial. Consequently, the trial judge instructed the jury during trial:

Your job in this case will still be to decide whether the plaintiff and her attorney proved by a preponderance of the evidence that these defendants who are on trial were negligent.

Of course, it may be possible that some of Dr. King's actions are relevant to that decision; and that's why he has testified and been present for cross examination. But your job is still going to be to decide whether these defendants have been proved by a preponderance of the evidence, as I shall instruct you when the trial is concluded, negligent.

The presence or absence of Dr. King for any such determination is something you should disregard.

Similar instructions were given before the jury retired to deliberate:

You heard evidence in the case that Dr. King and the District of Columbia, as operator of the Southwest Neighborhood Clinic, were sued by the plaintiff. And it's also obvious to you that neither of those defendants are in this courtroom before you in this trial. And the fact that they are not here is a matter which you should disregard in your determinations of the verdicts against

---

4. In addition to being an employee, Dr. Chidel was an owner of Wener.

these defendants which you will be asked to render.

As I explained, there are many ways that can happen within the law and some of them are quite complex and should not concern you. By saying that, however, I do not mean to imply that you must disregard any testimony about the Southwest Clinic or Dr. King or by Dr. King insofar, however as it may help you evaluate the claims made against the defendants who are in court now before you in this trial.[5]

On November 5, 1997, the jury rendered its verdict on a special verdict form, finding that: (1) Dr. Chidel and Wener were negligent, and that their negligence was the proximate cause of Ms. Hubbard's injury;[6] and (2) GSECH was independently negligent, but its independent negligence was not the proximate cause of Ms. Hubbard's injury. The jury awarded Ms. Hubbard one million dollars in damages, or $500,000 more than the settlement sum paid by Dr. King and the District.

After the jury published its verdict, the trial judge made factual findings in considering the claims for indemnification or contribution, declaring orally on November 5, 1997:

I find as fact that Dr. Chidel made a phone call to Dr. King . . ., [and that his] testimony that he did record that he contacted Dr. King directly to be credible as reported on the March 5, 1993, mammogram report.

I further find Dr. King's statement that he never remembers receiving it [is]—just [ ] frankly [ ] not credible. He really dropped the ball in this case terribly, terribly, terribly. I believe that he got the phone call and just, plain, forgot about it. I believe that he made no effort whatever to retrieve the March 5, 1993, mammogram. And he had a duty to do that. And his failure to do it was a violation of the standard of care for a referring physician.

I further find that [ ] the Southwest Clinic had sloppy record keeping. That if the report was not there, the clinic, through it's nurses and staff, in addition to Dr. King, had a duty to get it. And that their failure to do so was a violation of the standard of care for a health care facility, which it clearly is and was.

I am unable to make any findings of fact and conclusions of law with respect to whether Dr. King is the one who

---

5. During trial, Dr. King consistently maintained that Dr. Chidel never contacted him, *via* telephone or correspondence, with regard to the abnormality exhibited by Ms. Hubbard's mammogram. But, Dr. King also testified that in circumstances where, for whatever reason, he had not received his patient's mammogram report by a certain date, he would:
   [S]can the chart[, and] ask the nursing assistant to look for the mammogram report. If not there, then we call for it, as we normally do.
However, Dr. King testified that, in Ms. Hubbard's case, he did not perform this procedure because he "didn't have the heightened sense of expectation for [an] abnormal report" since "the mammogram from two different *sources* was told to be normal."

Contrary to Dr. King's assertions, Dr. Chidel maintained throughout trial that he did, in fact, contact Dr. King personally to inform him of the abnormal report. Furthermore, Dr. Chidel stated that, in the event that Dr. King had not received such information from him within a reasonable time, the relevant standard of care required Dr. King to investigate the whereabouts of the mammogram.

6. A question regarding the specific theory of Dr. Chidel's and Wener's negligence (*i.e.,* failure to telephone Dr. King after reading the mammogram, or to do proper follow-up to determine Dr. King's actions in response to the mammogram) was not included on the special verdict form.

should have corrected that kind of problem.... And, therefore, what I am ruling here is that it is the District of Columbia's responsibility as the operator of that clinic. It had a responsibility to make sure that Mrs. Hubbard's report got into her file. I cannot find that they received it and misplaced it, or what happened to it anymore than I can find out by a preponderance of the evidence—excuse me—that it never got there. Or that the postal service failed to deliver it. . . .

I further find that these violations of the standards of care for the Southwest Clinic and for Dr. King were the proximate cause of the injury to Mrs. Hubbard, both separate and together.

After making these factual findings, the trial judge gave the parties an opportunity to file written memoranda concerning the final disposition of the claims for contribution and indemnification. On December 23, 1997, the trial judge signed a memorandum order indicating, in part, that none of the pleadings before the court "includes a separate claim against the District of Columbia for negligent operation of the Southwest Clinic where Dr. King worked," but that "[t]he joint pretrial statement does include such a claim." Furthermore, the trial judge stated that "the court's findings of November 5 were primarily directed . . ." to the contribution issue. The judge also said:

When combined with the jury's verdict, it appears there were three tortfeasors in this case: Dr. Chidel was found negligent by the jury. Wener, Boyle was liable only vicariously as his employer. Greater Southeast Community Hospital was found by the jury to have had no proximate cause role in the plaintiff's injury, even though it was found independently negligent. The effect of this is that it was not a separate tortfeasor. Greater Southeast was found by the jury to have been the apparent employer of Dr. Chidel. Therefore, it, too, is only vicariously liable for Dr. Chidel's jury-found negligence. The net result of all these jury findings is that the trial defendants constituted one tortfeasor—Dr. Chidel and, vicariously, his two "employers. . . ."

The court found, however, independent negligence of both Dr. King *and* the Southwest Clinic operated by the District of Columbia. It found Dr. King negligent for forgetting about the telephone report the court found he received from Dr. Chidel and/or for not getting the written mammogram report he knew or should have known belonged in the plaintiff's record. The court also found the Clinic staff negligent for not getting the written report either, or properly filing it—so it would be seen by Dr. King and any other doctors at the Clinic treating plaintiff *even it* they themselves—or Dr. King particularly—failed in their duty to get the missing report. This is not a mere vicarious, employer-employee liability; Dr. King and the District of Columbia as operator of the Southwest Clinic are separate joint tortfeasors.

(Emphasis in original). The trial judge then recognized complications regarding the pleadings, and requested briefing on several questions.[7]

On January 12, 1998, Dr. Chidel and Wener sought leave to amend their plead-

7. These questions were: "[W]hat cross-claims or third party claims [do] the parties think the court has before it[?] Do the parties believe Civil Rule 15(b), "Amendments to conform to the evidence," applies? If so, how? Does or should the contribution analysis above differ when defendants Dr. Chidel and [GSECH] have not formally claimed against the District []? When even Wener['s] [] claim was only against the District as Dr. King's employer (except in the joint pretrial statement)?"

ings, alleging that they inadvertently failed to amend their third-party complaint against the District as an employer of Dr. King "to include a claim for contribution and indemnification against the District [ ] as an independent tortfeasor by reason of the negligence of employees other than Dr. King." Ms. Hubbard opposed the motion to amend.

The trial court reviewed the filings by the parties, which it had requested in its December 23, 1997 memorandum order, and concluded in part on February 2, 1998:

(1) the trial defendants are entitled to full indemnity from the settling defendant Dr. King, thus mooting the issue of contribution between two or among three joint tortfeasors, (2) if the court is wrong about full indemnity, ... the question of contribution is solely one of law which the appellate court will review afresh anyway; thus this court need not now decide the contribution issue.... [T]he court finds that Dr. King's and the Southwest Neighborhood Center's negligence was far more egregious, primary, direct, causative, correctable, avoidable, aggravating, superseding, and repetitive extending over many months compared to any negligence of the trial defendants. Dr. King's and the Southwest Neighborhood Center's negligence was prolonged inaction overlooking a known mammogram report that allowed the plaintiff's tumor to grow to the point her mastectomy—her total injury—was required. Their negligence was continuous; the trial defendants' negligence was not continuous and any duty they had ceased well before any injury occurred to plaintiff. Equity thus requires full implied indemnity to the trial defendants (who

are treated as one for purposes of such decision by reason of the jury's verdict)....

Since the court finds total indemnity due the trial defendants by Dr. King, the jury's verdict exceeding Dr. King's (and the District's) settlement makes the verdict a nullity; plaintiff, having made her settlement decision holding Dr. King and the District harmless, must live with it and is entitled to nothing more....

[I]f the court is wrong about full indemnity, and the question of contribution as between two or among three joint tortfeasors *does* have to be decided, with one exception as to exercise of possible discretion, the question of contribution is solely one of law which the appellate court will review afresh anyway; thus this court need not now decide the contribution issue....

(Emphasis in original). The trial court's Final Judgment Order of February 2, 1998 stated:

Consistent with this court's Memorandum Opinion of this same date, consistent with the jury's verdict herein on November 5, 1997, and consistent with the settlement and dismissal by [Ms. Hubbard] of all claims she had against defendant Dr. [ ] King and third-party defendant District [ ], it is, [ordered] that [Ms. Hubbard] shall take nothing from [ ] Dr. [ ] Chidel, Wener [ ], and [GSECH].... [8]

Ms. Hubbard noted a timely appeal.

## ANALYSIS

### *The Trial Court's Post-trial Findings and Indemnification Ruling*

Ms. Hubbard contends that the trial court erred by ruling, contrary to the

---

**8.** The trial judge again recognized "[t]he complications result[ing] from the state of the pleadings (or lack thereof) ...," but asserted that if it was authorized to exercise discretion under Super. Ct. Civ. R. 15(b), "it *will* treat this case as having all the requisite pleadings to produce what it has [ ] described [ ] as 'the factual, just result.' " (Emphasis in original).

jury's verdict, that Dr. Chidel was not negligent, and thus was entitled to indemnification from Dr. King and the District, as operator of the Southwest Clinic. Dr. Chidel claims that the trial court properly found that: "Dr. Chidel's only negligent conduct ... was that he did not check up on Dr. King to ensure that Dr. King had done what he was supposed to do, [and that] [t]hese findings of fact ... were totally consistent with the jury's findings of facts." Moreover, since the trial court found that Dr. King "dropped the ball terribly, terribly, terribly," and Dr. King "had indeed received a call from Dr. Chidel regarding Ms. Hubbard's mammogram," the trial judge did not err by deciding that Dr. Chidel and Wener were entitled to indemnification from Dr. King and the District. They maintain that: "It is crystalline that Ms. Hubbard's claim of negligence on the part of Dr. Chidel can only be characterized as innocuous, while the successive, extensive acts of negligence on the part of Dr. King resulted in extensive, severe injury to the appellant."

■■■ "Questions of [ ] indemnity pose legal issues that [are] resolved by the court rather than the jury." *District of Columbia v. Murtaugh*, 728 A.2d 1237, 1244 (D.C.1999). The court acts as fact finder to determine whether the second tortfeasor from whom contribution is sought was negligent. *See Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 188 n. 13 (D.C.1990). However, the trial court is bound by the jury's factual findings, unless it has granted an appropriate and timely post-trial motion which in effect sets aside the jury's verdict. *See Jones v. Schramm*, 141 U.S.App. D.C. 169, 172–73 n. 11, 436 F.2d 899, 902 (1970) ("the way in which the court decides a contribution claim is dependent on and affected by the verdict(s)"); *see also Washington Health-*

*care Corp. v. Barrow*, 531 A.2d 226, 230–31 (D.C.1987).

Here, the jury responded "yes" to two questions regarding Dr. Chidel and Wener: (1) "Do you find the defendants Dr. Chidel and Wener, Boyle & Associates were negligent?" and (2) "If *yes*, do you find that their negligence was a proximate cause of injury to the plaintiff Mrs. Hubbard?" Two theories of Dr. Chidel's and Wener's negligence were posited at trial: (1) the failure to make an initial telephone call to Dr. King to inform him of the results of the mammogram; and (2) the failure to follow-up to determine what action Dr. King had taken in response to the mammogram. The special jury verdict form did not ask the jury to indicate which of these theories of negligence prompted its finding that Dr. Chidel and Wener were liable to Ms. Hubbard. Nonetheless, in making post-trial factual findings the trial judge specifically ruled that "Dr. Chidel made a phone call to Dr. King ... [and that] Dr. King's statement that he never remembers receiving it [is]—just [ ] frankly [ ] not credible."

■■■ Without having requested a specific question on the jury verdict form, Dr. Chidel and Wener are estopped from arguing, and the trial court is precluded from ruling, that the evidence was insufficient to support the first theory of liability (Dr. Chidel's failure to make the initial call to Dr. King), where there was sufficient evidence, if believed by reasonable jurors, to support both theories of liability. As we held in *Newell v. District of Columbia*, 741 A.2d 28, 33 (D.C.1999):

[N]ot only is counsel in a civil case required to request a special verdict form to preserve a claim of error relating to fewer than all of the theories of liability (or defenses thereto) on which the jury permissibly could have based its verdict, but that in requesting a special verdict

form, counsel must state the request with sufficient precision to indicate the specific interrogatories that should be included in the special verdict form, object to their noninclusion, and include the proposed special verdict form in the record on appeal.

*Id.* at 333. Not only did Dr. Chidel and Wener fail to request a specific question as to the theory of their negligence on which the jury relied, but also the trial court specifically instructed the jurors that in determining whether Ms. Hubbard "proved by a preponderance of the evidence that [Dr. Chidel and Wener] were negligent, ... some of Dr. King's actions [may be] relevant...." Thus, the jurors undoubtedly took into consideration not only the version of events given by Dr. Chidel and Wener, but also that recounted by Dr. King. It is reasonable to conclude, then, that the jurors either accepted Dr. King's assertion that Dr. Chidel never called him to report the mammogram results, or considered Dr. Chidel's failure to follow-up with Dr. King to constitute significant and active negligence which constituted a proximate cause of Ms. Hubbard's injury.

Consequently, the trial court erred by finding that "Dr. Chidel made a phone call to Dr. King ... [and that] Dr. King's statement that he never remembers receiving it [is]—just [ ] frankly [ ] not credible." In making this finding, the trial court improperly rejected one theory of Dr. Chidel's and Wener's liability, on which sufficient evidence was presented to the jury and which the jury may have reasonably believed in reaching its verdict. Instead, the trial judge focused on the second theory of negligence (failure to take follow-up action with Dr. King) to support

his conclusion of "more egregious" and "continuous" negligence by Dr. King and the District, compared with "negligence [by Dr. Chidel and Wener that] was not continuous." However, under *Schramm, supra,* by which we are bound, *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), we are constrained to conclude that the trial court was bound by the jury's findings regarding the negligence of Dr. Chidel and Wener, and further, that "the equities [do not] support[ ]" the trial court's ruling that Dr. Chidel and Wener are entitled to indemnification from Dr. King and the District. *See District of Columbia v. Washington Hosp. Ctr.,* 722 A.2d 332, 339 (D.C. 1998) (en banc).

■■■ The trial judge in this case characterized Dr. King's and the Southwest Clinic's negligence as "continuous" and, in contrast, stated that, "[Dr. Chidel's and Wener's] negligence was not continuous and any duty they had ceased well before any injury occurred to plaintiff." However, if the jury reasonably believed that the standard of care, as Dr. Chidel testified, required that he telephone Dr. King to inform him of the suspicious mass, but that he failed to do so, or to follow-up to see what action Dr. King had taken,[9] his negligence may not be deemed *de minimis* or merely passive. A telephone call from Dr. Chidel to Dr. King, or timely follow-up contact to see what action Dr. King had taken in response to the suspicious March 1993 mammogram, undoubtedly would have resulted in a diagnosis earlier than July 1994. Thus, Dr. Chidel's and Wener's negligence, as the jury implicitly found, was active negligence.

We have said previously that: "Where joint tort-feasors are guilty of active negli-

---

9. Resolution of conflicts in evidence and credibility determinations are the province of the jury. *See Streater v. United States,* 478 A.2d

1055, 1058 n. 4 (D.C.1984); *Peterson v. United States,* 657·A.2d 756, 760 (D.C.1995).

gence and their negligence concurs in causing the injury, none is entitled to indemnity against the others but there may be contribution among them." *Early Settlers Ins. Co. v. Schweid,* 221 A.2d 920, 923 (D.C.1966); *see also R. & G. Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 548 (D.C.1991) ("[I]f the 'active' negligence of both defendants 'concurred in causing [the plaintiff's] injury,' ...., there is no equitable basis for a claim of indemnity...." (citation omitted)).[10] Similarly, given Dr. Chidel's and Wener's active negligence in this case, indemnity would be inappropriate. *Id.* Since indemnification is inappropriate on the facts of this case, and the trial court made post-trial findings that Dr. King and the District, as operator of the Southwest Clinic were negligent, we turn to the issue of contribution among joint tortfeasors.

### The Contribution Issue

Dr. Chidel and Wener claim that they are entitled to a contribution of $666,666.66 from Dr. King and the District. In arriving at this sum, they argue that "Dr. King and the District should be treated and counted as separate parties[,]" but that "Dr. Chidel and Wener are essentially one entity...." Ms. Hubbard contends, in essence, that Dr. Chidel and Wener should be deemed separate entities and that they would be entitled to a $200,000 contribution from Dr. King, but nothing from the District since: (1) the Southwest Clinic "was neither a defendant nor a third-party defendant"; (2) Dr. Chidel never asked for contribution from the District; and (3) under D.C.Code § 12–309, Dr. Chidel and

Wener did not give timely notice of their claim to the District.

In *Washington Hosp. Ctr., supra,* we set forth an explanation of contribution and the legal principles governing demands for it. 722 A.2d at 336–37. We said, in part:

Contribution is one of several theories used to apportion damages among tortfeasors to an injured party. In this jurisdiction, the law pertaining to the right of contribution among joint tortfeasors has been established by case precedent rather than by statute. *Lamphier v. Wash. Hosp. Ctr.,* 524 A.2d 729, 733 (D.C.1987). Under these precedents it is now well settled that there is a right of equal contribution among joint tortfeasors.... The contribution remedy is a way of securing "fairness to joint tortfeasors (by distributing the plaintiff's losses equitably among all wrongdoers) and deterrence (by ensuring that all parties responsible for the injuries will share in the cost of the offending conduct)." *Hall v. George A. Fuller Co.,* 621 A.2d 848, 850 n. 3 (D.C.1993) (citation omitted). Since we have not recognized degrees of negligence in this jurisdiction, contribution is apportioned equally among all tortfeasors. *Early Settlers, supra,* 221 A.2d at 923. Thus, "the fact that the negligence of one may be greater than that of another ... does not change the method of equally apportioning contribution, as the law of this jurisdiction does not recognize degrees of negligence." *Id.* .... An essential prerequisite for entitlement to contribution is that the parties be joint tortfea-

---

**10.** In *R. & G. Orthopedic Appliances, supra,* we considered whether R & G was entitled to indemnification from Howard University Hospital where R & G's negligence was allegedly responsible for ulcerations on the injured party's foot, but Howard University's subsequent negligence allegedly caused the amputation of the injured party's foot. We remanded the

case for any necessary clarification, after a new trial, of the trial judge's findings pertaining to the cross-claim for indemnification. *Id.* at 548–49. We also noted that: "Indemnity is an equitable doctrine, and each case must turn on its own circumstances." *Id.* at 548 n. 23.

sors in the sense that their negligence concurred in causing harm to the injured party ... "The law recognizes that there may not be a single proximate cause for every injury; several causes may combine to produce the harm." *R. & G. Orthopedic Appliances, supra,* 596 A.2d at 544 (citing *Hill v. McDonald,* 442 A.2d 133, 137 (D.C.1982)). Thus, to be joint tortfeasors it is sufficient if their independent acts combined to cause a single injury. *See Early Settlers, supra,* 221 A.2d at 923.

*Id.* at 336–37 (footnote and other citations omitted); *see also National Health Labs., Inc. v. Ahmadi,* 596 A.2d 555, 557 (D.C. 1991). Furthermore, in *Bragg v. Owens–Corning Fiberglas Corp.,* 734 A.2d 643 (D.C.1999), we reiterated the fundamental principle which controls the question of contribution when the plaintiff decides to settle with one party to the litigation: "When the plaintiff has settled with a party who has been deemed liable, the court awards the non-settling tortfeasor a *pro rata* credit—*i.e.,* a percentage reduction based on the number of defendants—against the verdict." *Id.* at 653.

■ Like equitable indemnification issues, we review questions of contribution *de novo. See Paul v. Bier,* 758 A.2d 40, 42 (D.C.2000) (citations omitted). Here, it is clear that Dr. Chidel and Wener customarily would be entitled to contribution since, in its post-trial ruling on the contribution and indemnification claims, the trial court adjudged Dr. King and the District as joint tortfeasors, and customarily, the principle of equal contribution of joint tortfeasors would apply. *Washington Hosp. Ctr., supra,* 722 A.2d at 336. We use the word "customarily" because there are at least two factors in this case which ulti-

mately will determine the resolution of the contribution issue: (1) the number of joint tortfeasors subject to the contribution remedy in this case; and (2) the impact of D.C.Code § 12–309, if any, on the right of Dr. Chidel and Wener to contribution.

■ The parties disagree as to what entities are subject to contribution. Those involved in the events resulting in the injury to Ms. Hubbard are: Dr. King, Dr. Chidel, Southwest Clinic, Wener, and GSECH; the District is also implicated because of its relationship to both Dr. King and the Southwest Clinic. However, the jury determined that GSECH's negligence was not the proximate cause of Ms. Hubbard's injury; therefore GSECH has no liability in this matter. Nor do we see anything in the record to indicate that the Southwest Clinic ever was made a party to this litigation. Nonetheless, perhaps understandably, given the pre-trial statement of the parties and the evidence presented at trial, the trial court's post-trial ruling specifically found that the District was responsible as an employer of Dr. King, and as operator of the Southwest Clinic; that the Southwest Clinic and Dr. King violated the standards of care owed to Ms. Hubbard; that these "violations ... were the proximate cause of the injury to [Ms.] Hubbard, both separate and together," and that Dr. Chidel and Wener "are entitled to contribution from the two other joint tortfeasors—Dr. King and the Southwest Clinic, both of whom settled through their employer-operator, the District of Columbia...." Therefore, assuming that Dr. Chidel and Wener are entitled to contribution,[11] the trial court must determine, on remand and on the basis of the record in this case, the respective status of Dr. King, the Southwest Clinic, and the District, spe-

---

11. We see no error in the trial court's determination that Dr. Chidel and Wener consti-

tute one tortfeasor rather than two.

cifically, whether they constitute a single tortfeasor or more than one or two tortfeasors.[12]

■ We next address the impact of D.C.Code § 12–309 on the contribution issue. Because of its indemnification ruling which, as we have indicated, was inappropriate in this case, the trial court raised, but sidestepped critical questions relating to the claims for contribution, including the applicability of § 12–309 to the cross claims and the third-party claim for contribution in this case. We can understand the trial court's apparent frustration with the state of the pleadings which undoubtedly impaired a cogent treatment of the contribution and § 12–309 issue. Therefore, in the interest of facilitating consideration of this issue on remand, we set forth guidance on this matter of apparent first impression.

In *Group Health Ass'n v. District of Columbia Gen. Hosp.*, 540 A.2d 1104 (D.C. 1988), we broached, but did not decide the question of the proper interpretation of § 12–309 with respect to a third party claim for contribution; no appeal had been taken from the trial court's ruling in that case. However, we observed in passing, that the trial court "specifically rejected GHA's argument that the notice period did not begin to run until GHA itself suffered an injury in the form of a judgment against it in favor of [the plaintiffs], holding instead that the time began to run from the date on which the [plaintiff's] suit was filed." *Id.* at 1106. We also noted that the trial court's dismissal "appears to be consistent with the majority of court decisions on the subject," but that in two other jurisdictions "the notice period begins to run from the date of the original plaintiff's injury," or "when the original defendant discovers the third-party defendant's alleged negligence." *Id.* at 1106 n. 6 (citations omitted).[13]

Here, Dr. Chidel and Wener argue that Wener's § 12–309 [14] notice to the District on April 30, 1996 was timely because it was given within six months of its being named as a party to Ms. Hubbard's lawsuit. Ms. Hubbard points out that Dr. Chidel never gave notice of his contribution claim to the District, and never filed an action against the District until after the jury's verdict. As for Wener, Ms. Hubbard argues that, "notice is due when there is notice to the claimant of an injury."

■ Section 12–309 "imposes a notice requirement on everyone with a tort claim against the District of Columbia, and compliance with its terms is 'mandatory as

---

**12.** At this point, we take no position on whether the trial court may properly exercise its discretion under Super. Ct. Civ. R. 15(b) to rule that proper pleadings relating to contribution have been filed against the District and the Southwest Clinic. We note, however, that the practice of some courts in complex multi-party litigation, before trial, is to deem that cross-claims and counterclaims have been filed. *See also Paul, supra*, 758 A.2d at 46–49.

**13.** A few courts have held that where a tortfeasor does not control the circumstances required for a timely statutory notice of claim, the lack of timely notice will not bar a contribution claim. *See Roehrig v. City of Louisville*, 454 S.W.2d 703, 705 (Ky.1970) and commenting that: ("[F]ailure of notice did not bar a claim of contribution ... because the claim normally would not accrue within the time allowed for giving notice.") (citation omitted).

**14.** D.C.Code § 12–309 (1995) provides, in relevant part:

An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage ...

a prerequisite to filing suit against the District.'" *District of Columbia v. Dunmore*, 662 A.2d · 1356, 1359 (D.C.1995) (quoting *Hardy v. District of Columbia*, 616 A.2d 338, 340 (D.C.1992)). "'Compliance with § 12–309 is a question of law that we review *de novo*.'" *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 436 (D.C.2000) (quoting *District of Columbia v. Ross*, 697 A.2d 14, 17 (D.C.1997) (citation omitted)). Furthermore, since "'it is in derogation of the common law principle of sovereign immunity, section 12–309 is to be construed narrowly against claimants.'" *Id.* (quoting *Gross v. District of Columbia*, 734 A.2d 1077, 1081 (D.C. 1999) (other quotations omitted)).

In *Dunmore, supra*, we specifically found that "under section 12–309, the six-month [statutory notice] clock begins to run from the moment the plaintiff sustains the injury, not from the moment a cause of action accrues." *Id.* at 1359 (citing *DeKine v. District of Columbia*, 422 A.2d 981, 985 (D.C.1980)). However, in that case, we were not called upon to construe § 12–309 in the context of a third-party claim for contribution. Thus, we are confronted with an issue of first impression in this case: What constitutes an "injury" under § 12–309 in a third-party claim for contribution? Or, when is an injury sustained for purposes of a third-party contribution claim? [15]

■ We are faced with a statute that does not explicitly address third-party claims. Thus, as the Court of Appeals of Maryland said in *Haupt v. State*, 340 Md. 462, 667 A.2d 179 (1995): "'[A]bsent clear legislative direction, third-party actions

and [the requirements of the notice statute] must be reconciled to reflect the best interests of justice and fairness both to the third-party plaintiff and to the State.'" *Id.* at 186 (quoting *Leppo v. State Highway Admin.*, 330 Md. 416, 624 A.2d 539, 546–47 (1993)). Clearly, in a first-party complaint, "injury" under § 12–309 means at the time of the accident or damage to the plaintiff. *Dunmore, supra*, 662 A.2d at 1359. However, a decision that a defendant/third-party plaintiff in a contribution action must give notice of its claim to the District within six months of plaintiff's injury appears unfair to the defendant/third party plaintiff, since the plaintiff in the underlying action may not file suit until a few days before the expiration of the statute of limitations. Hence, we agree with the highest state court in Maryland that: "For purposes of a third[-]party claim ..., 'injury' has a different meaning than it has in the first party context." *Id.* at 185. Logically, "injury" in a third-party claim for contribution refers to the potential harm to a defendant/third-party plaintiff, not to the injured plaintiff. *Id.*[16] At the time the injury to the plaintiff occurs, a political subdivision's (*e.g.*, a state's or municipality's) involvement in the circumstances leading to the injury may not be known or obvious. Thus, it would be unfair to impose on a potential defendant/third party plaintiff a burden to detect such involvement at the time of the plaintiff's injury. *See id.* at 186. On the other hand, it also seems unfair to decide that since a claim for "contribution does not accrue until judgment has been entered against the party seeking ... contri-

---

**15.** For a discussion of this issue, *see* H.H. Henry, Annotation, *Claim for Contribution or Indemnification From Another Tortfeasor As Within Provisions of Statute or Ordinance Requiring Notice of Claim Against Municipality*, 93 A.L.R.2d 1385 (1964), as amended by the West Group (2001).

**16.** *But see Hansen v. D.M. & I.R. Railway*, 292 Minn. 503, 195 N.W.2d 814 (1972) (the date of injury to the plaintiff controls timely notice to a municipality, even in a third party claim for contribution).

bution," *id.* (citations omitted), notice to the political subdivision is not required until the judgment has been entered against the defendant/third-party plaintiff, thus depriving the political subdivision, the District in the case before us, of an "adequate opportunity for investigation to determine facts, and to protect District revenues against unreasonable claims." *George v. Dade,* 769 A.2d 760, 765 (D.C. 2001) (footnote omitted).[17]

The Maryland rule regarding notice in a third-party contribution claim context finds a fair middle ground that is neither the time of the plaintiff's injury, nor when judgment has been entered against a defendant/third party plaintiff. The rule focuses on "the moment the [defendant] or third party plaintiff [is] able to bring a third party complaint." *Id.* "[T]he earliest point at which a third-party plaintiff actually will be exposed to liability, so as to be able to provide the State with the notice required ..., is when he or she has been served with the plaintiff's complaint for damages." *Id.* (footnote omitted). At that point, the defendant/third party plaintiff has been "injured" in a § 12–309 context because of exposure to liability.

■ Applying the Maryland rule to the instant case, we hold that the 180–day period set forth in § 12–309 begins to run when a defendant/potential third party plaintiff has been sued, *i.e.,* served with the plaintiff's summons and complaint for damages. Since the trial court granted Ms. Hubbard's motion to add Wener as a defendant in early April 1996, the statutory time for notice to the District began to run in early April 1996. Wener notified the District of its contribution claim on May 1, 1996. Therefore, we further hold that Wener's notice of its contribution claim against the District fell well within the time frame required by § 12–309.

■ Whether Dr. Chidel was required to give separate notice to the District of his claim for contribution, and whether a proper claim for contribution by Dr. Chidel and Wener against the District was before the trial court must be decided, in the first instance, by that court on remand. In addition, as indicated above, and assuming that all of the contribution claims of Dr. Chidel and Wener are properly before the trial court, the trial judge must determine the number of joint tortfeasors subject to the contribution remedy, and then decide the appropriate *pro rata* credit or percentage reduction of the jury award of $1 million against Dr. Chidel and Wener.

Accordingly, we reverse and remand this matter to the trial court for further post-trial proceedings consistent with this opinion.

*So ordered.*

---

17. The accrual of the claim rule, however, seems fair in a statute of limitations context. *See Brua v. Olson,* 621 N.W.2d 472 (Minn.

App.2001); *Bay Ridge Air Rights, Inc. v. State of New York,* 44 N.Y.2d 49, 404 N.Y.S.2d 73, 375 N.E.2d 29 (1978).